UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- X
                                  :

FLATIRON HEALTH, INC.,          :

                     Plaintiff,    :       __ CV __

                           :

       - against -        :    **COMPLAINT FOR**

                           :    **DECLARATORY AND**

TEMPUS, INC. and KENNETH CARSON,  :    **INJUNCTIVE RELIEF AND**
M.D.,                          :    **DAMAGES**

                           :

                 Defendants.  :

------------------------------------------- X

      Plaintiff Flatiron Health, Inc. ("Flatiron" or the "Company"), by its undersigned attorneys Davis Wright Tremaine LLP, hereby brings this complaint for anticipatory repudiation of contract and tortious interference with contract, seeking declaratory and injunctive relief and damages against defendants Tempus, Inc. ("Tempus") and Kenneth Carson, M.D. ("Carson") (collectively, "Defendants"), and in support alleges as follows:

<u>**NATURE OF THE ACTION**</u>

      1.     This is an action for declaratory judgment, injunctive relief and damages to remedy the unlawful conduct of Defendants. More particularly, Carson intends imminently to breach his contract with Flatiron, and Tempus has tortiously interfered with Flatiron's contract with Carson. If Carson is permitted to breach his contract with Flatiron, Carson and Tempus will wrongfully use Flatiron's confidential information and trade secrets to compete against Flatiron. Flatiron seeks to hold Defendants accountable, to prevent them from exploiting Flatiron's confidential information and causing substantial irreparable harm and damages their unlawful activities have caused and will continue to cause Flatiron.

**PARTIES**

2.      Plaintiff Flatiron Health, Inc. is a Delaware corporation with its principal place of business at 233 Spring Street, New York, New York.

3.      Upon information and belief, Defendant Tempus, Inc. is a Delaware corporation with its principal place of business at 600 West Chicago Avenue, Suite 510, Chicago, Illinois.

4.      Defendant Kenneth Carson, M.D. is an individual whose last known address is in Missouri and, who upon information and belief, is in the process of relocating to Illinois.  From November 2, 2016 until he resigned his employment effective September 26, 2019, Carson was employed by Flatiron as its Senior Medical Director.  Carson traveled regularly to Flatiron's principal place of business in New York, New York to perform his work.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(l).  There is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

6.      Along with other relief as set forth below, Plaintiff seeks a declaration of its rights, pursuant to 28 U.S.C. § 2201, to resolve an actual controversy within this Court's diversity jurisdiction.

7.      The Court has personal jurisdiction over Defendants because each have regularly done business in New York State and this District and Flatiron's claims in this action arise out of those contacts.  In addition, Carson consented to personal jurisdiction in this District in the Employee Covenants Agreement he entered into with Flatiron (the "Agreement").  Agreement, § 7(3). (A copy of the Agreement is attached hereto as Exhibit A.)  Finally, Tempus committed a tortious act either within the state, or without New York State causing injury to Flatiron within

New York State, and Tempus should have reasonably expected that its tortious conduct would have consequences in New York State.

8.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Flatiron's claims occurred in this District. In addition, Carson consented to venue in this District in the Agreement.  Agreement, § 7(3).

## FACTS

### *Flatiron and its Business*

9.     Founded in 2012, Flatiron is a healthcare technology and data services company whose mission is to improve lives by learning from the experience of every cancer patient. Flatiron achieves this by gathering, processing, and analyzing clinical data and molecular data from the electronic health record ("EHR").

10.     The central question Flatiron seeks to answer is "how can we organize, process, and analyze cancer patients' medical data in a way that leads to credible, de-identified, real-world evidence in support of observational and hypothesis-driven research across the breadth of oncology, including but not limited to patient outcomes, comparative effectiveness, quality of care, health care policy, and oncology drug development?"

11.     Flatiron's customers include biopharmaceutical companies with oncology therapeutics, and academic research centers.

12.     Using its proprietary and innovative methodology, which took years and the expenditure of more than $200 Million to develop, Flatiron (i) extracts patient oncology data that resides in the EHR it gathers from its large network of community cancer clinic partners and other diverse sources, including both clinical and molecular data; (ii) aggregates/links that data to other datasets; and (iii) analyzes that aggregated data in order to derive insights about treatments and patient outcomes.

13.     Certain of Flatiron's customers contract with Flatiron to create custom data sets, tailored to the customers' specialized and often confidential, proprietary needs and preferences.

14.     In order to obtain the relevant data from EHR, Flatiron must extract data that is embedded deep within "unstructured documents," meaning things like doctors' notes, radiology reports, and condolence cards that indicate a patient has died.  Flatiron has spent 7 years and invested more than $200 Million developing its proprietary software tools and methodology for extracting structured data (data points that are analyzable, meaning that they can be used for mathematical computations) from unstructured data.

15.     To protect the confidential information and trade secrets used in its business, Flatiron requires its employees, as a condition of employment, to sign an Employee Covenants Agreement.

16.     To ensure the security of its confidential information (including trade secrets), Flatiron also takes ongoing, active measures to protect such information from disclosure – even to Flatiron employees who have no business need to access it.

17.     Indeed, Flatiron stores, processes, and handles confidential information in centrally managed repositories.  The repositories are hosted in physically hardened data centers managed by some of the leading companies in the data protection industry.  The data is encrypted – both when it is transmitted, and when it is at rest – which adheres to the standards set by the U.S. National Institute for Standards and Technology.

18.     Access to Flatiron's confidential information is protected by sophisticated identity verification and authorization enforcement, which requires a strong password and, upon successful entry of the correct password, dual-factor authentication through the use of an additional physical device, such as a cellular phone.

19.     The files and folders storing confidential data in each of Flatiron's centrally-managed repositories are set to "deny by default," which means that when a file is created or stored, only the user who creates or stores it will have access to that file, unless or until he or she manually places the file in a shared electronic location, or invites other users to view the file. Access to the repositories themselves is centrally and actively managed by Flatiron's Information Technology staff.

20.     To monitor which employees are accessing which files, Flatiron tracks and logs user activity in each centrally managed data repository, so that Flatiron can see in real time, at a minimum: (i) the users accessing files; (ii) the files being accessed; (iii) the actions taken to and within each file; (iv) and the date and time of access to each file.

21.     Flatiron also requires each new employee to complete security and privacy training during their first week of employment, and to receive detailed instructions on protecting confidential information.

22.     Finally, to ensure that Flatiron remains abreast of the latest developments and best practices in data security, the Company submits its data protection policies and controls to regular review by third-party information technology specialists.

23.     However, even the strongest data protection measures will not shield Flatiron from imminent, significant harm if Carson is permitted to flout his obligations under the Agreement.

### *Tempus and its Business*

24.     Founded in 2015 (three years after Flatiron), Tempus also gathers and analyzes clinical and molecular data for use in cancer treatment.

25.     Tempus describes itself on its website, tempus.com, as "a technology company that is building the world's largest library of molecular and clinical data and an operating system to make that data accessible and useful. We enable physicians to deliver personalized care for patients through our interactive analytical and machine learning platform. We provide genomic sequencing services and analyze molecular and therapeutic data to empower physicians and researchers to make real-time, data-driven decisions. Our goal is for each patient to benefit from the treatment of others who came before by providing the health care industry with tools that learn as we gather more data."

26.     Tempus is one of Flatiron's primary competitors in this niche business.

27.     An August 31, 2019 article in *Forbes Magazine* observes that "Tempus faces stiff competition," and then specifically identifies "big data firm Flatiron Health" as a Tempus competitor.

28.     According to an article published on August 29, 2018, the CEO of Tempus, Eric Lefkofsky, told the *Chicago Tribune* (in reference to Tempus's expansion plans), "[t]here are incredibly talented people in our space all over the country...."

29.     As reported in a May 30, 2019 article in the *Chicago Tribune*, Tempus expects to add several hundred additional employees to its ranks by the end of this year.

30.     In this case, Tempus has sought to execute on its growth plan by offering employment to Carson, a key executive at Flatiron – notwithstanding that Tempus is well aware that Carson is contractually barred from joining Tempus for one year following his voluntary resignation from Flatiron.

***Carson's Role and Access to Flatiron's Confidential Information and Trade Secrets***

31.     Carson was employed as Flatiron's Senior Medical Director from November 2, 2016 until he resigned his employment effective September 26, 2019.

32.     Prior to and throughout his employment with Flatiron, Carson was a Board-certified practicing hematologist and medical oncologist who continued to see patients part-time while employed by Flatiron.

33.     Throughout his nearly three years of employment with Flatiron, Carson had access to highly confidential information and strategies regarding Flatiron's business, and he was intimately involved in developing and implementing a number of those strategies.

*Carson is Highly Knowledgeable About, and Contributed to the Development of, Flatiron's*
*<u>Technical Trade Secrets and Other Highly Valuable Proprietary and Confidential Information</u>*

34.     In his capacity as Senior Medical Director, Carson was a member of Flatiron's leadership team for the Research Oncology function, responsible for overseeing day-to-day research planning and execution, which included providing input into how data sets are created and used to answer clinically important questions in the field of oncology.

35.     Carson also had access to, and possesses intimate knowledge of, Flatiron's proprietary data extraction and analysis methods, including its overall approach to processing unstructured data; how its proprietary, de-identified EHR-derived data sets are developed and used for all products; its specific approaches for key data points, such as date of death and progression of disease/tumor response; algorithms for selecting patient cohorts; algorithms for linking to external data sets; and methods for data analysis, including external control arm and hybrid control arms.

36.     Carson possesses confidential information regarding which variables Flatiron's proprietary, syndicated data models are based on; how Flatiron decides which variables to include in those syndicated data models; and why.

37.     Carson also possesses confidential information regarding which variables are included in the custom data sets Flatiron has developed to meet specific customers' unique requests, needs or preferences.

38.     Carson also possesses confidential information regarding Flatiron's "data curation infrastructure" – meaning its proprietary methodology for extracting certain structured data (such as a patient's date of death) from unstructured data. Carson also possesses confidential information regarding Flatiron's molecular and genomic data curation processes, including in connection with its proprietary partnership with Foundation Medicine.

39.     Carson is intimately familiar with Flatiron's proprietary methodology for driving research from concept to data interpretation, so as to turn data analysis into a valuable product.

40.     Carson is intimately familiar with Flatiron's most closely-guarded technical and strategic secrets – the "special sauce" which gives Flatiron a distinct advantage over its rivals, like Tempus, in this narrow, but highly competitive space of oncology-focused data.

41.     Flatiron's proprietary methodologies of data extraction and analysis constitute a trade secret under New York law.

### *Carson Also Had Access to, and Used, Flatiron's Confidential Business Information*

42.     Carson's work for Flatiron focused on real-world evidence ("RWE") generation, which is Flatiron's largest line of business, accounting for roughly 75% of its revenue.

43.     Carson was a member of Flatiron's five-person RWE business leadership team and, beginning in early 2019, he was the clinical and scientific lead for RWE at Flatiron.

44.     By virtue of this position with Flatiron, Carson possesses confidential information regarding Flatiron's business strategies, including with regard to its existing product lines and new products that are currently in its pipeline and are expected to launch, and with regard to the areas it plans to invest in (including its planned approach and anticipated timeline).

45.     Carson also possesses confidential information regarding Flatiron's business development plans and efforts, including the detailed terms of Flatiron's existing partnerships and its consideration of potential new partnerships and acquisitions under consideration as ways to access new data.

46.     For example, as recently as a month before his resignation, Carson was involved in drafting revised collaboration terms for its partnership with Foundation Medicine.

47.     Carson has confidential information concerning Flatiron's global expansion plans, including the particular nations Flatiron has identified as base-nations, the identity and exploratory discussions with potential partners and key stakeholders in those nations, and the status of those discussions.

48.     As a member of Flatiron's 5-person RWE leadership team, Carson received monthly reports of the Company's financials, including revenue by product line, details of customer contracts, pricing per product, and cost structure.

49.     Carson possesses confidential information about Flatiron's pricing to customers, because he was part of the RWE leadership team which sets the pricing. As a member of that leadership team, Carson signed off on or had direct oversight of all Statements of Work ("SOW") for that line of business – even those for which he did not perform services.

50.     By virtue of his access to this confidential information, Carson also has insider knowledge about the current limitations in Flatiron's proprietary platform and methodologies, and its plans to eliminate those limitations.

51.     Carson also possesses confidential information that belongs to Flatiron customers, which Flatiron is expected by those customers to safeguard, such as customer product pipelines and development strategy, and the particular research question a customer is seeking to answer regarding the efficacy, potency and/or unintended effects of one of the drugs manufactured by that customer.  Flatiron's customer contracts contain strict confidentiality provisions, including regarding the specific nature of the project, and its pricing.  Flatiron's customers consider their product development strategies highly confidential and, indeed, share with Flatiron only those details Flatiron requires to perform the project work.

52.     Such confidential customer information cannot be readily ascertained outside of Flatiron, and was obtained by it through the expenditure of substantial time and money.

*Carson was the "Face" of Flatiron's Primary Business, and has an Encyclopedic Knowledge of Flatiron's Customers' Confidential Information*

53.     Carson routinely presented Flatiron processes and capabilities at external venues.

54.     Along with others, Carson coauthored a substantial number of peer-reviewed publications (including manuscripts and meeting abstracts) in the course of his employment by Flatiron.  These publications include, for example, "Real-world outcomes of patients with metastatic non-small cell lung cancer treated with programmed cell death protein 1 inhibitors in the year following U.S. regulatory approval" (published in The Oncologist, 24(5), 648–656. https://doi.org/10.1634/theoncologist.2018-0307); "Real-world evidence of male breast cancer (BC) patients treated with palbociclib (PAL) in combination with endocrine therapy (ET)," American Society of Clinical Oncology (ASCO) Annual Meeting (May 31 - June 4, 2019;

Chicago, IL); and "Identifying the Prognostic Significance of Genomic Alterations in a Real-World, EHR-Derived Clinico-Genomic Database (CGDB)," ASCO Annual Meeting (June 1-5, 2018; Chicago, IL).

55.     Flatiron regularly entrusted to Carson the responsibility for serving as its primary voice to its customers, government regulators, and others on a wide variety of topics.

56.     For example, Carson represented Flatiron in multiple discussions with the FDA, including a two-way discussion between Flatiron and FDA in July 2019 regarding Flatiron's data curation methods, and in discussions in which Flatiron participated on behalf of customers in connection with regulatory submissions.

57.     Carson ran an advisory board Flatiron held in June 2019 with external key opinion leaders on Flatiron's approach to capturing the tumor response variable.

58.     Carson took a leading role in sales and customer development at Flatiron, and he sat on oversight committees with customers, such as Flatiron's scientific advisory board with one of Flatiron's largest customers.   Carson also represented Flatiron on Scientific Steering Committees with key Life Sciences customers.   Because he participated in these committee meetings with Flatiron's biggest customers, Carson possesses confidential information regarding these customers' top priorities and how Flatiron supports and plans to increase its support of these priorities.

59.     On Flatiron's behalf, Carson took the lead on a number of customer "pitch" meetings, participated in numerous project scoping with customers, and participated in quarterly business updates with customers.   For example, Carson met approximately monthly with Flatiron's largest customer.

60.     Carson's close relationship with some of Flatiron's most highly-regarded customers – a relationship Flatiron supported and promoted – creates a substantial risk that he may be able to divert all or part of Flatiron's business. The data extraction and analysis processes which Flatiron designs, builds, tests, and employs in computer software are not standard "off-the-shelf" data solutions.  Not only are they unique generally, but a significant portion of Flatiron's RWE business is based upon building relationships with its customers and working closely with each customer to provide data solutions that meets the customers' specifications and needs (typically based on the life-saving drug, process or procedure they are working on).

61.     Customers come to Flatiron seeking a data solution that is not available on the market and, indeed, must be specially crafted.  Carson, with knowledge of Flatiron's capabilities, learned what the customer wants to do, worked with the customer to determine what specifications are required, and then worked in tandem with the customer to develop the solution needed. This commonly involved configuring the data extraction and analyses systems (with Flatiron's software engineers) and testing those systems over lengthy periods of time.

62.     Because of his extensive experience at Flatiron and his encyclopedic knowledge of Flatiron's data processing, technology platform and data analysis techniques, Carson excelled in developing product solutions that met Flatiron's customers' needs.

63.     Because of his close work with Flatiron's customers, Carson has knowledge of their product plans, preferences and specifications. Indeed, the very fact that certain customers are talking to and/or working with Flatiron on certain projects is confidential and those customer relationships are governed by non-disclosure agreements. In many cases, customers are relying on Flatiron to provide data that will make the customers' product more competitive in the

marketplace, thereby giving those customers a competitive advantage in their respective industries.

64.     Carson has intimate knowledge of Flatiron's RWE customers, including their plans, needs, and specifications, by virtue of his responsibilities as Flatiron's Senior Medical Director, his years of experience at Flatiron, and his participation in customer interactions.

*Carson Will Inevitably Disclose Flatiron's Confidential Information to His New Employer*

65.     One of Flatiron's primary competitors today is Tempus.

66.     Carson's knowledge of Flatiron's Confidential Information (as defined in the Agreement) is extremely valuable and will provide a competitive advantage to Tempus. Flatiron has perfected technologies and has built a customer base that its competitors, including Tempus, would greatly profit from having. Many of Flatiron's data solutions are custom-made for customers, and refined over time for the specific needs of each of its customers. Tempus is in the same business – extracting medical records data and building computerized data-analysis tools for oncology-industry drug and other healthcare companies.

67.     Acquired and honed over three years of employment at Flatiron, Carson's specialized knowledge of Flatiron's trade secrets and confidential information, including its customer relationships, is directly applicable and invaluable to Tempus's oncology-data business, and will inevitably be disclosed to Tempus if Carson is permitted to work there.

68.     By employing Carson, Tempus will be able to short-cut many of the efforts that Flatiron has had to undertake to get to its current market position, to the direct detriment of Flatiron.

69.     The idea that Carson can stop himself from drawing upon and disclosing Flatiron's trade secret and confidential information while working at Tempus is so far-fetched as to lack any credibility.

### The Restrictive Covenants

70.     On September 1, 2016, Carson signed Flatiron's offer letter, thereby accepting Flatiron's offer of employment as its Senior Medical Director, based in New York.

71.     The offer letter provided as follows: "By executing this letter below, you agree that during the course of your employment and thereafter that you shall not use or disclose, in whole or in part, any of the Company's or its customers' or affiliates' trade secrets, confidential and proprietary information, including without limitation, database schemas, source code, screenshots of proprietary software, product specifications, software architecture, customer lists and information, to any person, firm, corporation, or other entity for any reason or purpose whatsoever other than in the course of your employment with the Company…."

72.     Flatiron's employment of Carson was expressly conditioned upon his acceptance of and compliance with the Agreement.

73.     In this regard, the offer letter Carson signed on September 1, 2016 provided, "You also will be required to execute the annexed employee non-disclosure and invention assignment agreement (the 'Covenants Agreement'), the terms of which are in addition to the terms of this offer letter."

74.     Carson signed the Agreement on September 1, 2016.

75.     The Agreement contains narrowly drafted and limited restrictions on Carson's post-employment activity. Specifically, it provides that until one year following his separation from employment for any reason, Carson "will not … participate in (x) any business that is

similar to those which the Company has created, has under development or are the subject of active planning from time to time during [Carson's] employment by the Company, or (y) a Competing Business." Agreement, § 4.

76.    The Agreement defines a "Competing Business" as the business of providing software products, data analysis, data, clinical trial research services, analytics and electronic medical record systems to hospitals, physicians, community practices, health care centers, and pharmaceutical companies in the oncology industry...." *Id.*

77.    The Agreement further provides that, during the Restricted Period, Carson "will not directly or indirectly ... do anything to divert or attempt to divert from the Company any business of any kind, including, without limitation, solicit or interfere with any of the Company's customers, customers, members, business partners or suppliers...." *Id.*

78.    The Agreement further requires Carson not to use or disclose Flatiron's Confidential Information for his personal benefit, for the benefit of any other person or entity, or in any manner adverse to Flatiron's interests. Agreement, §2(2).  The Agreement defines Confidential Information as "all of the trade secrets, know-how, ideas, business plans, pricing information, the identity of and any information concerning customers or suppliers, computer programs (whether in source code or object code), procedures, processes, strategies, methods, systems, designs, discoveries, inventions, production methods and sources, marketing and sales information, information received from others that the Company is obligated to treat as confidential or proprietary, and any other technical, operating, financial and other business information that has commercial value, relating to the Company, its business, potential business, operations or finances, or the business of the Company's affiliates or customers, of which I may have acquired or developed knowledge or of which I may in the future acquire

15

or develop knowledge of during my work for the Company, or from my colleagues while working for the Company." Agreement, §2(1).

79.     The Agreement specifically contemplates injunctive relief as a possible remedy for the Agreement's breach or threatened breach.   In this regard, the Agreement states, "I understand and agree that if I breach or threaten to breach any of the provisions of this agreement the Company would suffer immediate and irreparable harm and that monetary damages would be an inadequate remedy.  I agree that, in the event of my breach or threatened breach of any of the provisions of this agreement, the Company shall have the right to seek relief from a court to restrain me (on a temporary, preliminary and permanent basis) from using or disclosing Company Confidential Information or Inventions or otherwise violating the provisions of this agreement, and that any such restrain shall be in addition to (and not instead of) any and all remedies to which the Company shall be entitled, including money damages.  The Company shall not be required to post a bond or other security to secure against an imprudently granted injunction (again, whether temporary, preliminary or permanent." Agreement, §7(2).

### *Necessity of the Covenants*

80.     Each of the restrictive covenants contained in the Agreement is reasonable in time and area, necessary to protect Flatiron's legitimate interests (including its confidential information and trade secrets, and substantial relationships with existing customers), not harmful to the general public, and not unreasonably burdensome to Carson.

81.     Carson was given access to, knew, and does know Flatiron's confidential financial data, pricing information, product development and design, growth/expansion and other strategic plans (e.g., potential acquisition targets, partnerships, and international expansion); disclosure of such information is inevitable as long as Carson is involved in the business of

providing software products, data analysis, data, clinical trial research services, analytics and electronic medical record systems to hospitals, physicians, community practices, health care centers, and pharmaceutical companies in the oncology industry.

82.     The active, ongoing, substantial relationships that Flatiron has developed and maintains with a number of its customers are protectable under New York law.

83.     Carson directly participated in the maintenance of these customer relationships on Flatiron's behalf, and was the "face" of Flatiron's business in their collective eye.

84.     Carson's use and/or disclosure of Flatiron's Confidential Information and trade secrets would put Flatiron at a competitive disadvantage.

85.     The confidential information and trade secrets which Carson possesses solely by virtue of his employment by Flatiron could easily be used by a Flatiron competitor to Flatiron's competitive disadvantage.

### *Carson's Wrongful Conduct*

86.     On August 27, 2019, Carson verbally informed Flatiron that he intended to resign his employment with Flatiron and commence employment with Tempus.

87.     In these initial resignation discussions, Carson, acutely aware that he is contractually obligated not to compete against Flatiron for one year, raised the matter with a Flatiron executive.   Rather than acknowledge his contractual obligation and/or attempt to articulate any legitimate reason why his planned employment with Tempus would not run afoul of that obligation, he cavalierly explained that it was of no moment because Tempus would provide him "legal support from their white glove [sic] New York City law firm."

88.     In the days and weeks immediately following this surprise announcement by Carson, Flatiron sought to explore with him alternative scenarios under which he might be

willing to reconsider and to continue his employment with Flatiron. Carson gave Flatiron the impression that he was considering this possibility, and that his decision to join Tempus was not set in stone.

89.    Simultaneously, Flatiron informed Carson that he was contractually precluded from joining Tempus. More specifically, on September 6, 2019, Flatiron's General Counsel, Kathleen Blanchard ("Blanchard"), informed Carson that he was contractually bound by the Agreement and the post-employment obligations set forth therein, which include a contractual promise not to commence employment with a Competing Business for one year following his separation from employment with Flatiron. Blanchard informed Carson that Tempus is a Competing Business as defined by the Agreement, and that he is therefore contractually precluded from commencing employment with Tempus for one year following his resignation from Flatiron.

90.    Blanchard advised Carson during this discussion that Flatiron would seek to enforce its rights and his obligations (including by filing a lawsuit and seeking injunctive relief), if he decided to join Tempus notwithstanding that he is contractually precluded from doing so.

91.    In response to Blanchard's warning, Carson said he had been told by Tempus and by unnamed "third party attorneys" that he was not precluded from commencing employment there.

92.    By email dated September 17, 2019, Carson informed Flatiron that he "had reached a difficult decision" – namely, that he was voluntarily resigning his employment and intends to commence employment with Tempus.

93.     Carson's September 17 email acknowledged that Blanchard had previously warned him that his employment by Tempus would breach his contractual obligations to Flatiron.

94.     Carson nevertheless blithely commented in his September 17 email that "[w]e can let the attorneys sort that out."

95.     By letter dated and delivered on September 23, 2019, Flatiron advised Carson that for one-year post employment, he is barred from (i) participating in a "Competing Business," and that Flatiron deems Tempus as a Competing Business, and (ii) soliciting Flatiron customers (and others), and that he is barred from using or disclosing Confidential Information.

96.     Carson's employment at Tempus will constitute a breach of the non-compete contained in the Agreement.

97.     Carson's work on behalf of Tempus will be inevitably informed by (and therefore, he will be inevitably using and disclosing) Flatiron's Confidential Information and trade secrets.

98.     But for Carson's employment by Flatiron as its Senior Medical Director since 2016, Carson would not have gained personal knowledge of Flatiron's Confidential Information, proprietary methodologies, and trade secrets.

99.     This information will inevitably be used and disclosed by Carson to benefit Tempus – a direct competitor of Flatiron – to Flatiron's detriment.

### *Tempus's Wrongful Conduct*

100.    For at least the past several months, Tempus has been seeking to expand its oncology leadership team.

101.    Several months ago, at least one other key member of Flatiron's staff was contacted by an executive search firm acting on Tempus's behalf, who described Tempus as a

"company working to revolutionize the diagnosis and treatment of oncology...." The recruiter further explained that, "[w]e are helping recruit a VP, Oncology Research targeting medical oncologists who can build connectivity between the data/analytics they are producing with clinical practice."

102.    Upon information and belief, this is the same role that Tempus ultimately offered to Carson, and which he has accepted, notwithstanding that he is precluded contractually from doing so, and notwithstanding that Tempus is well aware of this contractual bar on his employment by Tempus.

103.    Carson informed Flatiron in late August 2019, when he first disclosed that he was entertaining an offer of employment from Tempus, that Tempus had assured him it has a "top law firm" to deal with any effort by Flatiron to enforce its rights under the Agreement.

104.    By letter dated September 23, 2019, Flatiron informed Tempus that for one year post-employment, Carson is contractually barred from participating in a "Competing Business" (and soliciting Flatiron's employees and customers) and that Flatiron deems Tempus as a Competing Business.

105.    Tempus has not responded in any fashion to this letter, and has disregarded this request which was made by Flatiron in its letter to Tempus: "Kindly confirm in writing within 48 hours of your receipt of this letter that Tempus will honor the terms of Dr. Carson's contractual commitments to Flatiron, and will not interfere in any way with his one-year covenant not to compete (including by not hiring or otherwise engaging him during the one-year period following the Resignation Date."

106.    Thus, Tempus is aware of Carson's contractual obligations to Flatiron and has declined to confirm to Flatiron that it will refrain from tortuously interfering with his fulfillment of those obligations.

107.    In response to Flatiron's reminders that he is contractually bound by post-employment obligations to Flatiron that preclude his employment by Tempus prior to September 27, 2020, Carson has informed Flatiron more than once (including before he gave notice to Flatiron of his resignation on September 17) that Tempus has advised him otherwise.

108.    Upon information and belief, Tempus has induced and encouraged Carson to accept employment with Tempus, including by providing him with legal advice and agreeing to defend and indemnify him in any litigation resulting from his breach of the Agreement.  By so doing, Tempus is facilitating, aiding and abetting Carson's breach of contract, tortiously interfering with Carson's contractual obligations to Flatiron, and ratifying and accepting the benefit of this wrongful conduct.

### *Imminent Irreparable Harm*

109.    Carson's employment by Tempus will result in Carson violating the Agreement, and his duties and responsibilities on behalf of Tempus by their nature will result in Carson inevitably using or disclosing Flatiron's confidential information and trade secrets.

110.    If Carson is allowed to commence and/or continue employment with Tempus in violation of the Agreement, it will cause irreparable harm to Flatiron.  Flatiron's trade secrets and confidential information, developed by Flatiron at great expense and with great effort over the past 7 years, will cease to be a competitive advantage for Flatiron if Tempus is allowed to use them.  The nature of the losses that will accrue over time if Flatiron's confidential information

and trade secrets are divulged to Tempus or used to help it compete against Flatiron, cannot be fully quantified or measured.

111.   In addition, Flatiron's confidential business information – e.g., its strategic plans, products in development, pricing schemes, etc. – will be known to Tempus and used against Flatiron for Tempus's competitive advantage.

112.   Finally, Flatiron's customer relationships will be interfered with, and its customers' confidential information will be disclosed without authorization.

113.   The Agreement expressly recognizes and acknowledges that a violation of its restrictions would cause irreparable harm, warranting injunctive relief.

## COUNT I
### Anticipatory Repudiation of Contract
### Against Kenneth Carson, M.D.

114.   Flatiron repeats and realleges each and every allegation set forth in Paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.   Carson willfully entered into the Agreement with Flatiron, which contains certain restrictive covenants, including a covenant that precludes Carson's employment by a Competing Business within one year after his separation from employment by Flatiron.

116.   In exchange for agreeing to the restrictions, Carson was employed by Flatiron and received substantial compensation from Flatiron in connection with that employment.

117.   The restrictive covenants are necessary, reasonable, and supported by adequate consideration.

118.   Carson resigned his employment with Flatiron and repeatedly announced his intention to commence employment with Tempus.

119.   Tempus is a Competing Business, as that term is defined in the Agreement.

120.    By becoming employed by Tempus, Carson will imminently breach the non-compete provision of the Agreement.

121.    The confidentiality provision of the Agreement prohibits Carson from divulging or using any of Flatiron's confidential information.

122.    Carson's employment by Tempus will require the violation of Carson's ongoing contractual obligation not to use or disclose Flatiron's Confidential Information.

123.    Specifically, Carson has retained knowledge of Flatiron's trade secrets and other confidential information, and that of Flatiron's customers, and will inevitably use this information when working for Tempus.

124.    Carson will imminently violate the confidentiality provision of the Agreement by using Flatiron's confidential information for his own benefit and for the benefit of Tempus.

125.    Carson has made a positive and unequivocal expression of his intent not to perform his obligations under the Agreement. As such, Carson has anticipatorily repudiated material terms of the Agreement, including the non-competition and confidentiality obligations, as set forth herein.

126.    As a result of such conduct, Carson is liable immediately for total breach of the Agreement.

127.    Flatiron has suffered and will continue to suffer irreparable and incalculable harm, including the loss of confidential information and trade secrets which cannot be remedied by an assessment of monetary damages (although such damages would be well in excess of $75,000.00). No adequate remedy at law exists for an anticipatory repudiation of this nature.

## COUNT II
### Tortious Interference with Contractual Relations
### Against Tempus

128.    Flatiron repeats and realleges each and every allegation set forth in Paragraphs 1 through 127 of this Complaint as if fully set forth herein.

129.    Carson entered the Agreement with Flatiron, which contains certain restrictive covenants.

130.    Tempus became aware of the Agreement no later than September 23, 2019, when Flatiron delivered a letter to Tempus regarding the Agreement.  Upon information and belief, Tempus was aware of the Agreement at least a month before then, when it sought to reassure Carson that it has a "top" and/or "white glove [sic]" law firm to deal with any effort by Flatiron to enforce its contract with Carson.

131.    Tempus intentionally and unlawfully procured Carson's imminent breach of the Agreement, by hiring Carson in violation of the non-compete obligation in the Agreement that precludes him from working for Tempus for one year following his resignation.

132.    As a direct and proximate result of Tempus's unlawful activities complained of herein, Tempus has damaged and continues to damage Flatiron in an amount that is presently not ascertainable, but will be established at trial as in excess of $75,000.00.

## COUNT III
### Declaratory Judgment

133.    Flatiron repeats and realleges each and every allegation set forth in Paragraphs 1 through 132 of this Complaint as if fully set forth herein.

134.    An actual controversy has arisen and now exists between Flatiron and Defendants concerning whether Carson's employment by Tempus is prohibited by the terms of the Agreement.

135.    Flatiron thus desires and requests that a judicial determination be made, pursuant to 28 U.S.C. § 2201, that Carson is contractually barred from working for Tempus in any capacity, and from soliciting Flatiron customers and employees, during the one-year period following Carson's separation from employment by Flatiron, and from retaining, using, or disclosing to third parties any of Flatiron's trade secrets and confidential information.

136.    A judicial determination of the parties' rights and duties is necessary and appropriate at this time and under these circumstances to resolve the controversy between the parties.

## **PRAYER FOR RELIEF**

WHEREFORE, Flatiron respectfully requests that judgment be made and entered as follows:

a)    Declaring, pursuant to 28 U.S.C. § 2201, that Carson is contractually barred from working for Tempus in any capacity, and from soliciting Flatiron customers and employees, for the one-year period following Carson's separation from employment by Flatiron, and that he is contractually barred from retaining, using, or disclosing to third parties any of Flatiron's trade secrets and confidential information;

b)    Preliminarily and permanently enjoining Carson from (i) commencing employment with Tempus prior to September 26, 2020; (ii) doing anything prior to September 26, 2020 to divert or attempt to divert from Flatiron any business of any kind, including, without limitation, soliciting or interfering with any of the Company's customers, customers, members, business partners or suppliers...."; and (iii) using or disclosing any confidential information or trade secrets belonging to Flatiron;

c)      Preliminarily and permanently enjoining Tempus from (i) directly or indirectly employing Carson prior to September 26, 2020; and (ii) using or disclosing any confidential information or trade secrets belonging to Flatiron;

d)      Awarding Flatiron monetary damages in an amount to be determined at trial;

e)      Awarding Flatiron attorneys' fees;

f)      Awarding Flatiron costs of suit, pre-judgment and post-judgment interest in the maximum amounts allowed by law;

g)      Awarding Flatiron punitive and/or exemplary damages in an amount to be determined at trial, to punish Defendants for their willful, malicious and wrongful conduct and to deter future misconduct; and

h)      Awarding Flatiron such other and further relief as the Court deems just, equitable and proper.


Dated: New York, New York
       September 27, 2019

                                    Respectfully submitted,

                                    DAVIS WRIGHT TREMAINE LLP

                                    By:_____
                                       Lyle S. Zuckerman
                                       Laura Sack

                                    1251 Avenue of the Americas, 21st Floor
                                    New York, New York 10020
                                    (212) 489-8230

                                    *Attorneys for Plaintiff Flatiron Health, Inc.*