UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x

FLATIRON HEALTH, INC.,

                        Plaintiff,

       - against -

TEMPUS, INC. and KENNETH CARSON,
M.D.,

                    Defendants.

---------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:

19 CV 8999


# MEMORANDUM OF LAW IN SUPPORT OF FLATIRON HEALTH, INC.'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION


DAVIS WRIGHT TREMAINE LLP
Lyle S. Zuckerman
Laura Sack
1251 Avenue of the Americas
21st Floor
New York, New York 10020
(212) 489-8230
*Attorneys for*
*Plaintiff Flatiron Health, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL SUMMARY ......................................................................................................... 2

ARGUMENT .......................................................................................................................... 4

I.  FLATIRON WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE
    RELIEF ...................................................................................................................... 5

II.  FLATIRON IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS .................... 10

    A.  Carson Unequivocally Repudiated His Contractual Obligations, Which Are
        Reasonable Limitations On His Post-Employment Conduct ...................................... 10

        1.  Carson's Anticipatory Repudiation ................................................................. 10

        2.  The Protective Covenants are Valid and Enforceable .................................... 11

    B.  Flatiron is Likely to Prevail on its Claim for a Declaratory Judgment ...................... 14

    C.  Flatiron is Likely to Prevail on its Claim of Tortious  Interference Against Tempus. 14

III.  SUFFICIENTLY SERIOUS QUESTIONS GO TO THE MERITS AND THE
      BALANCE OF THE EQUITIES WEIGHS IN FAVOR OF PLAINTIFF ............................ 16

IV.  THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER ...................... 17

CONCLUSION .................................................................................................................... 18

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alphonse Hotel Corp. v. Tran,*
    828 F.3d 146 (2d Cir. 2016) ................................................................................. 5

*American Para Professional Systems, Inc. v. Labone, Inc.,*
    175 F. Supp. 2d 450 (E.D.N.Y. 2001) ............................................................... 15

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
    784 F.3d 887 (2d Cir. 2015) ................................................................................. 5

*Bus. Intelligence Servs., Inc. v. Hudson,*
    580 F. Supp. 1068 (S.D.N.Y. 1984) ................................................................... 12

*Cardwell v. Thermo Fischer Scientific,*
    2010 WL 3825711 (S.D.N.Y. Sept. 23, 2010) ................................................... 13

*Continental Cas. Co. v. Coastal Sav. Bank,*
    977 F.2d 734 (2d Cir. 1992) ............................................................................... 14

*Estee Lauder Cos, v. Batra,*
    430 F. Supp. 2d 158 (S.D.N.Y. 2006) ........................................................ *passim*

*Free Country Ltd. v. Drennen,*
    235 F. Supp. 3d 559 (S.D.N.Y. 2016) ................................................................. 5

*Global Switching Inc. v. Kasper,*
    No. 06 Civ. 412, 2006 WL 1800001 (E.D.N.Y. June 29, 2006) ......................... 7

*Iannucci v. Segal Co., Inc.*
    No. 06 Civ. 4720, 2006 WL 8407380 (S.D.N.Y. June 26, 2006) ....................... 9

*IBM v. Papermaster,*
    No. 08 Civ. 9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ....... *passim*

*Johnson v. Nextel Commc'ns, Inc.,*
    660 F.3d 131 (2d Cir. 2011) ............................................................................... 11

*La Luna Enterprises, Inc. v. CBS Corp.,*
    74 F. Supp. 2d 384 (S.D.N.Y. 1999) ................................................................... 5

*Licci v. Lebanese Canadian Bank,*
    672 F.3d 155 (2d Cir. 2012) ................................................................................. 5

*Liveperson, Inc. v. 24/7 Customer, Inc.,*
    83 F. Supp. 3d 501 (S.D.N.Y. 2015) ................................................................... 6

*Lumex, Inc. v. Highsmith,*
    919 F. Supp. 624 (E.D.N.Y. Mar. 19, 1996) .............................................. 6, 8, 9

*N. Atl. Instruments, Inc. v. Haber,*
    188 F.3d 38 (2d Cir. 1999) ........................................................................... 5, 6, 9

*Natsource LLC v. Paribello,*
    151 F. Supp. 2d 465 (S.D.N.Y. 2001) ........................................................... 12

*Nostrum Pharmaceuticals, LLC v. Dixit,*
    No. 13 Civ. 8718 (CM), 2016 WL 5806781 (S.D.N.Y. Sept. 23, 2016) ................ 13

*Oneida Nation of New York v. Cuomo,*
    645 F.3d 154 (2d Cir. 2011) .......................................................................... 5

*Payment Alliance Int'l v. Ferreira,*
    530 F. Supp. 2d 477 (S.D.N.Y. 2007) .................................................... *passim*

*St. John's Univ. v. Bolton,*
    757 F. Supp. 2d 144 (E.D.N.Y. 2010) ......................................................... 15

*Ticor Title Ins. Co. v. Cohen,*
    173 F.3d 63 (2d Cir. 1999) .................................................................. 11, 16

*Tyco Healthcare Group LP d/b/a Covidien v. Ross,*
    No. 3:11 Civ. 373, 2011 WL 1790186 (D. Conn. May 10, 2011) ...................... 10

*Wilton v. Seven Falls Co.,*
    515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) ................................. 14

**State Cases**

*Alside Div. of Associated Materials Inc. v. Leclair,*
    743 N.Y.S.2d 898 (3d Dep't 2002)............................................................... 12

*Battenkill Veterinary Equine P.C. v. Cangelosi,*
    768 N.Y.S.2d 504 (3d Dep't 2003)............................................................... 12

*BDO Seidman v. Hirshberg,*
    93 N.Y.2d 382 (1999)................................................................................ 13

*Gold Bond Stamp Co. of N.Y. v. E.F. MacDonald Stamp Co. et al.,*
    230 N.Y.S.2d 467 (1st Dep't 1962) .............................................................. 15

*Integra Optics, Inc. v. Messina,*
    41 N.Y.S.3d 719 (Sup. Ct. Albany Cty., 2016) .............................................. 13

*Kaplan v. Madison Park Grp. Owners, LLC,*
    942 N.Y.S.2d 522 (1st Dep't 2012).............................................................. 11

*Lama Holding Co. v. Smith Barney Inc.,*
    88 N.Y.2d 413 (1996)................................................................................ 15

*Long Island Am. Ass'n Football Club v. Manrodt,*
    23 N.Y.S.2d 858 (Sup. Ct. Queens Cty. 1940)............................................... 15

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Group,*
    87 N.Y.2d 614 (1996)................................................................................ 15

*Princes Point LLC v. Muss Dev. L.L.C.,*
    30 N.Y.3d 127 (2017)................................................................................ 10

*Tenavision, Inc. v. Neuman,*
    45 N.Y.2d 145 (1978)..................................................................................................... 10

**Federal Statutes**

Declaratory Judgment Act, 28 U.S.C. § 2201(a)............................................................... 14

**Rules**

Federal Rules of Civil Procedure
    65 ....................................................................................................................................... 4
    65(b) ................................................................................................................................. 17

Plaintiff Flatiron Health, Inc. ("Flatiron"), by its attorneys Davis Wright Tremaine LLP, respectfully submits this Memorandum of Law in Support of its Application for a Temporary Restraining Order and Preliminary Injunction against Flatiron's former employee, defendant Kenneth Carson, M.D. ("Carson"), and his new employer, defendant Tempus, Inc. ("Tempus").

## PRELIMINARY STATEMENT

Flatiron is a healthcare technology and data services company. More specifically, it gathers, processes, and analyzes clinical and molecular data from oncology patient electronic health records for biopharmaceutical customers and major academic research centers. Carson is a medical doctor and researcher who, from November 2, 2016 until his voluntary resignation effective September 26, 2019, had been employed by Flatiron in a key technical, leadership and customer-facing position. Carson is highly knowledgeable about, and has contributed to the development of, Flatiron's trade secrets and other confidential and proprietary information – including its "secret sauce" algorithms and data analysis techniques. He also is intimately familiar with Flatiron's strategic plans and goals, its key financial information, and its customers' confidential information.

In stark violation of his Employee Covenant Agreement (the "Agreement"), Carson has resigned from Flatiron to commence employment with one of its primary competitors – co-defendant Tempus. If Carson is permitted to commence such employment in violation of his Agreement, he will undoubtedly reveal Flatiron's trade secrets and other proprietary and confidential information that are at the heart of its competitive advantage.

Flatiron's legitimate business interests are directly threatened by Carson's employment by Tempus. Indeed, Carson's employment by Tempus creates a real and unavoidable risk that Flatiron's trade secrets and other confidential and proprietary information inevitably will be used by him and by Tempus to the commercial and competitive detriment of Flatiron. In the absence of injunctive and equitable relief, Flatiron will suffer irreparable harm.

## FACTUAL SUMMARY[1]

Founded in 2012, Flatiron is a healthcare technology and data services company. It gathers, processes, and analyzes clinical data and molecular data from electronic health records ("EHR"). The central question Flatiron seeks to answer is "how can we organize, process, and analyze cancer patients' medical data in a way that leads to credible, de-identified, real-world evidence in support of observational and hypothesis-driven research across the breadth of oncology, including but not limited to patient outcomes, comparative effectiveness, quality of care, health care policy, and oncology drug development?"

Flatiron's customers include biopharmaceutical companies with oncology therapeutics, and academic research centers. Using its proprietary and innovative methodology, which took years and the expenditure of more than $200 Million to develop, Flatiron (i) extracts patient oncology data that resides in electronic health records ("EHR") it gathers from its large network of cancer clinic partners and other diverse sources, including both clinical and molecular data; (ii) aggregates/links that data to other datasets; and (iii) analyzes that aggregated data in order to derive insights about treatments and patient outcomes.

To protect the confidential information and trade secrets used in its business, Flatiron requires its employees, as a condition of employment, to sign an Employee Covenants Agreement. The Agreement contains narrowly drafted and limited restrictions on Carson's post-employment activity. Among other things, the Agreement provides that for one year following his separation from employment for any reason, Carson will not participate in any businesses that are either (i) similar to or (ii) in competition with ("Competing Business") Flatiron. The Agreement narrowly defines a "Competing Business" as the business of providing software products, data analysis, data, clinical trial research services, analytics and

---

[1] For a detailed statement of facts, we respectfully refer the Court to the Declarations of Nat Turner, Neal Meropol, and Alexandra Buder Shapiro. Every statement in this Summary is supported by the Declarations.

electronic medical record systems to hospitals, physicians, community practices, health care centers, and pharmaceutical companies in the oncology industry.

To further protect its trade secrets, Flatiron employs active measures to protect its confidential and proprietary data from disclosure – including to Flatiron employees who have no business need to access it. Flatiron stores, processes, and handles confidential information in centrally managed repositories, which are hosted in physically hardened data centers managed by some of the leading companies in the data protection industry. The data is encrypted – both when it is transmitted, and when it is at rest – which adheres to the standards set by the U.S. National Institute for Standards and Technology. Access to Flatiron's confidential data is protected by sophisticated identity verification and authorization enforcement, which requires a strong password and, upon successful entry of the correct password, dual factor authentication through the use of an additional physical device, such as a cellular phone. The files and folders storing confidential data in each of Flatiron's centrally managed repositories are set to "deny by default," which means that when a file is created or stored, only the user who creates or stores it will have access to that file, unless or until he or she manually places the file in a shared electronic location, or invites other users to view the file. Access to the repositories themselves is centrally and actively managed by Flatiron's Information Technology staff.

Carson was Flatiron's Senior Medical Director, and a member of Flatiron's leadership team for the Research Oncology function, responsible for overseeing day-to-day research planning and execution. In this role, Carson had access to, and possesses intimate knowledge of, Flatiron's trade secrets for driving research from concept to data interpretation, so as to turn data analysis into a valuable product. He knows, and can reconstruct, Flatiron's "special sauce" which gives Flatiron a distinct advantage over its rivals (including Tempus) in the narrow, but highly competitive space of oncology-focused data. Among other things, Carson is intimately

3

familiar with Flatiron's proprietary data extraction and analysis methods; how its proprietary, de-identified EHR-derived data sets are developed and used for all products; algorithms for selecting patient cohorts; algorithms for linking to external data sets; methods for data analysis, including external control arm and hybrid control arms; information regarding which variables Flatiron's proprietary, syndicated data models are based on; and how Flatiron decides which variables to include in those syndicated data models.

As a member of Flatiron's five-person business leadership team for the unit that generates 75% of its revenue, Carson was privy to, and often had responsibility for, Flatiron's most confidential and proprietary business information, such as Flatiron's business strategies, including its existing product lines and new products in the development pipeline; strategic plans, including Flatiron's consideration of potential new partnerships and acquisitions, and its global expansion plans; and revenue by product line, pricing per product, cost structure, and customer pricing.

Finally, Carson possesses confidential information that belongs to Flatiron customers, which Flatiron is expected by those customers to safeguard. Among other things, he had access to and knowledge of Flatiron's customers' product pipelines and development strategy, and the particular research question a customer is seeking to answer regarding the efficacy, potency and/or unintended effects of one of the drugs manufactured by that customer.

## ARGUMENT

### FLATIRON'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD BE GRANTED

Flatiron seeks a temporary restraining order and preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure to prevent the irreparable harm that will undoubtedly flow from Carson's breach of his contractual duties to Flatiron.

Under the familiar standard for injunctive relief, a temporary restraining order and preliminary injunction should be granted whenever the plaintiff can demonstrate: "(1)

irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of [the Plaintiff]," and (3) that the preliminary injunction is in the interest of the public. *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016) (applying standard for temporary restraining order).

As set forth below, Flatiron has satisfied the above elements and has demonstrated its entitlement to a temporary restraining order and injunctive relief.

## I.      FLATIRON WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF

Flatiron will suffer irreparable injury due to the use and/or disclosure of its trade secrets.

New York courts define a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the employer] an opportunity to obtain an advantage over competitors who do not know or use it." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (internal quotation marks and citations omitted).[2]

In determining whether a trade secret exists, the New York courts have considered the following factors to be relevant: "(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his

---

[2] New York law applies to this matter.  First, as between Flatiron and Carson, the Agreement provides that "any and all matters arising directly or indirectly herefrom shall be governed by and construed and enforced in accordance with the internal laws of the State of New York . . . without giving effect to the conflict or choice of law principles thereof." Agreement § 7(3). "[W]here the parties agree that a certain jurisdiction's law controls, this is sufficient to establish choice of law." *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) (internal quotation marks and citations omitted).  Next, as for Flatiron's tort claim against Tempus, New York courts apply "the law of the jurisdiction having the greatest interest in the litigation." *Licci v. Lebanese Canadian Bank*, 672 F.3d 155, 157 (2d Cir. 2012) (internal quotation marks and citations omitted).  Of relevance here, "when the defendant's [tortious] conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong . . . is determined by where the plaintiffs' injuries occurred." *La Luna Enterprises, Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 389 (S.D.N.Y. 1999) (quoting *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 195 (1985)) (alterations in original). The injuries in this case are felt by Flatiron in New York.

business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Liveperson, Inc. v. 24/7 Customer, Inc.,* 83 F. Supp. 3d 501, 515 (S.D.N.Y. 2015) (quoting *N. Atl. Instruments, Inc. v. Haber,* 188 F.3d 38, 44 (2d Cir. 1999) (internal quotation marks omitted)).  Secrecy is the most important consideration.

There can be no doubt that all of the above technical, business, and customer confidential information known by Carson is a trade secret, or otherwise protectable by an appropriately tailored non-competition agreement. *See, e.g., Payment Alliance Int'l v. Ferreira,* 530 F. Supp. 2d 477 (S.D.N.Y. 2007) (according trade secret status in restrictive covenant context to:  software "activation system" and information about company's sales contracts and marketing strategies.); *Estee Lauder Cos, v. Batra,* 430 F. Supp. 2d 158, 176 (S.D.N.Y. 2006) (holding the following to be trade secrets: marketing plans, "confidential products currently under development and product innovations scheduled for the coming years," and "information about the stage of development of products in the pipeline"); *Lumex, Inc. v. Highsmith,* 919 F. Supp. 624, 629-30 (E.D.N.Y. Mar. 19, 1996) (concluding that "objectives" and "profit margins" were confidential where they related to specific "new and future equipment" developed by employer). To be sure, Flatiron's information is not known outside of its walls and it is not known by employees except those with a need to know; Flatiron has taken extreme measures to guard its secrecy, Flatiron has spent in excess of $200 Million to develop this information; and it will take any competitor years and enormous resources to duplicate the information.

Carson's defection to one of Flatiron's primary competitors, together with the risk that he will use and disclose the trade secrets that he learned at Flatiron, more than satisfies the

criteria for finding irreparable injury in a non-compete case: "'[a] trade secret once lost is, of course, lost forever' and, therefore, such a loss 'cannot be measured in money damages.' *Estee Lauder,* 430 F. Supp. 2d at 174 (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984)); *accord IBM v. Papermaster,* No. 08 Civ. 9078 (KMK), 2008 WL 4974508, at *7 (S.D.N.Y. Nov. 21, 2008). For this reason, when a former employee is "competing with his or her former employer, particularly when such activity is prohibited by a restrictive covenant or is facilitated by the misappropriation of trade secrets or customer information, courts have often taken a somewhat relaxed approach to the irreparable harm inquiry, and in certain circumstances have found it appropriate to presume the existence of such an injury." *Global Switching Inc. v. Kasper,* No. 06 Civ. 412, 2006 WL 1800001, at *12 (E.D.N.Y. June 29, 2006) (quoting *Innoviant Pharmacy, Inc. v. Morganstern,* 390 F. Supp. 2d 179, 188-89 (N.D.N.Y. 2005) (internal quotation marks omitted)).

Even where no trade secret has yet been disclosed to the new employer, courts find irreparable harm where there is a risk those secrets will inevitably be disclosed because "'the movant [here, Flatiron] competes directly with the prospective employer and the transient employee [here, Carson] possesses highly confidential or technical knowledge concerning. . . marketing strategies, or the like.'" *Estee Lauder,* 430 F. Supp. 2d at 174 (quoting *Earthweb, Inc. v. Schlack,* 71 F. Supp. 2d 299, 309 (S.D.N.Y. 1999)). "[E]ven if [the employee] acted with the best intentions, 'he may unintentionally transmit information gained through his association with [his former employer] during his day to day contact' with his new employer." *Payment Alliance,* 530 F. Supp. 2d at 482 (quoting *Global Telesystems, Inc. v. KPNQwest, NV,* 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001)).

For example, in *Papermaster,* a court in this District preliminarily enjoined an IBM employee from working for a competitor, Apple, in threatened violation of his non-competition agreements. *See Papermaster,* 2008 WL 4974508, at *7-9. The court entered the injunction

despite that the former employee had not yet disclosed any confidential information to Apple, there was no evidence that he intended to make any such disclosure, and he did not act in any way in bad faith.  Despite this, the court concluded that "it is likely that Mr. Papermaster inevitably will draw on his experience and expertise" at IBM, and that such inevitable disclosure justifies prospective enforcement of the non-competition obligation. *Id.* at *9.[3] Such a conclusion of inevitable disclosure is just as compelling here, where Carson has been "inculcated with some of [Flatiron's] most sensitive and closely-guarded technical and strategic secrets, [and thus] it is no great leap for the Court to find that plaintiff has met its burden of showing a likelihood of irreparable harm." *Id.* at *8.

For another example, a Court in this District issued a preliminary injunction to bar violation of a noncompetition agreement by an executive who was knowledgeable about his former employer's development and marketing of a proprietary software application. *See Payment Alliance,* 530 F. Supp. 2d at 482, 485. In *Payment Alliance,* the former employee was not involved in the design of the software at the source code level, and thus could not duplicate the system.   Nonetheless, the Court ruled that he had sufficient knowledge about the development and implementation of the system that he should be enjoined from working for a competitor that could make use of the information. *Id.* at 481-82. Given the direct competition between the old and the new employers, and that the defecting employee would be working in a similar capacity, permitting the new employment "creates a risk that disclosure of [plaintiff's trade secrets] is inevitable," even if inadvertent. *Id.* at 482.

The law does not require actual disclosure of trade secrets, or intent to make disclosure, before issuance of an injunction where, as here, there is a likelihood that the former employer's

---

[3] As the court observed in *Papermaster,* "[T]he Court has no evidence before it that Mr. Papermaster has disclosed any IBM trade secrets to date. The harm to IBM, however, is more likely to derive from inadvertent disclosure of the IBM trade secrets that have defined Mr. Papermaster's long career. Put another way, what other base of technical know-how could Mr. Papermaster draw upon to perform his new and important job? Thus, while the Court ascribes no ill-will to Mr. Papermaster, the Court finds that the likely inevitability of even inadvertent disclosure is sufficient to establish a real risk of irreparable harm to IBM." 2008 WL 4974508, at *10 (citing *Payment Alliance,* 530 F. Supp. 2d at 482; *Lumex,* 919 F. Supp. at 632).

confidential information will inevitably be used or disclosed. *See Estee Lauder,* 430 F. Supp. 2d at 174; *Payment Alliance,* 520 F. Supp. 2d at 482; *Lumex,* 919 F. Supp. at 631. The factors that guide courts in determining whether there is a risk of inevitable disclosure include: "'(1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets.'" *Papermaster,* 2008 WL 4974508, at *7 (quoting *Payment Alliance,* 530 F. Supp. 2d at 482) (other citations omitted).

Here, all of the factors favor injunctive relief. Tempus is a direct competitor of Flatiron's; Carson cannot be expected to work for Tempus without using the trade secrets that he learned and developed at Flatiron.  Such information would be of significant value to any competitor of Flatiron, and particularly to Tempus – one of Flatiron's primary competitors which was formed three years after Flatiron, and is chasing Flatiron as the industry leader.  If Carson's knowledge is transferred to Tempus, Tempus will be provided unfair competitive advantage by allowing it to avoid expending the time and resources to develop the processes, algorithms, and methodologies developed by Flatiron.

Finally, it is more than noteworthy that Carson acknowledged in the Agreement that irreparable injury would result from his breach <u>or threatened breach</u> of the post-employment covenants.  (Agreement, §7(2)).  Such contractual provisions, while not dispositive, support a finding of irreparable harm. *See, e.g., N. Atl. Instruments Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (relying on former employee's acknowledgement that a breach of his agreement would cause "irreparable injury" to the employer); *Iannucci v. Segal Co., Inc.*, No. 06 Civ. 4720, 2006 WL 8407380, at *3 (S.D.N.Y. June 26, 2006) ("A movant's demonstration of

irreparable harm is strengthened significantly where the employee has previously acknowledged — most often in an employment agreement — that his or her own breach of a restrictive covenant entitles the employer to injunctive relief because of the irreparable injury the movant would incur.").

## II. FLATIRON IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS

Flatiron is likely to prevail on its claims for repudiation of contract, declaratory judgment, and tortious interference with contract. The same facts that support a finding of irreparable harm in the absence of a preliminary injunction also demonstrate Flatiron's likelihood of success on the merits. "In non-compete cases, such as this one, the irreparable harm analysis and the likelihood of success on the merits analysis are closely related and often conflated." *Papermaster*, 2008 WL 4974508, at *6 (quoting *Int'l Creative Mgmt., Inc. v. Abate*, No. 07 Civ. 1979 (PKL), 2007 WL 950092, at *2 (S.D.N.Y. Mar. 28, 2007)); *Tyco Healthcare Group LP d/b/a Covidien v. Ross*, No. 3:11 Civ. 373, 2011 WL 1790186, at *3 (D. Conn. May 10, 2011).

### A. Carson Unequivocally Repudiated His Contractual Obligations, Which Are Reasonable Limitations On His Post-Employment Conduct

#### 1. Carson's Anticipatory Repudiation

Under New York law, breach of a contract can occur before the deadline for performance of the obligations in that contract have elapsed. If a party makes a "positive and unequivocal" expression of intent not to perform, anticipatory repudiation of a contract is deemed to have occurred. *Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 150 (1978); *see also Princes Point LLC v. Muss Dev. L.L.C.*, 30 N.Y.3d 127, 133 (2017). Such a statement "'can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach, or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.'" *Id.* (quoting *Norcon Power Partners v. Niagara Mohawk Power Corp.*, 92 N.Y.2d

458, 463 (1998)). Where one party has committed anticipatory repudiation of a contract, the other party is entitled "to immediately claim damages for a total breach." *Id.* (citing *Am. List Corp. v. U.S. News and World Report, Inc.*, 75 N.Y.2d 38, 44 (1989)). The intent of this doctrine is to give "the non-repudiating party an opportunity to treat a repudiation as an anticipatory breach without having to futilely tender performance or wait for the other party's time for performance to arrive." *Kaplan v. Madison Park Grp. Owners, LLC*, 942 N.Y.S.2d 522, 525 (1st Dep't 2012) (citing *Cooper v. Bosse*, 444 N.Y.S.2d 955, 957 (2d Dep't 1981)).

Here, there can be no argument that Carson has repudiated his post-employment contractual commitments to Flatiron. He has repeatedly informed Flatiron that he was resigning to work for Tempus. Tempus is a primary competitor of Flatiron (and thus a "Competitive Business" as defined in the Agreement), and so, Carson's employment by Tempus violates his contractual one-year non-competition obligation. Such employment will inevitably result in Carson's use and disclosure of Flatiron's trade secrets and confidential information, which also is barred by the Agreement. Accordingly, Carson has made "positive and unequivocal" expression of intent to breach the Employment Agreement.[4]

### 2. The Protective Covenants are Valid and Enforceable

Under New York law, the validity of a restrictive covenant "depends in the first place upon whether [it] is reasonable in time and geographic area." *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir. 1999). If it is, "enforcement will be granted to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique." *Id.* at 70. "In this equation, courts [also] must weigh the need to protect the employer's legitimate business

---

[4] To state a claim for breach of contract under New York law, "the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011). Flatiron has properly plead in the Complaint that it entered into the Agreement with Carson, that it performed under the Agreement by employing him, and that Carson commencing employment with Tempus constitutes a breach that will result in damages.

interests against the employee's concern regarding the possible loss of livelihood. . . ." *Id.* at 69.

"[T]here are no per se lines demarcating what constitutes an unreasonable durational or geographic scope." *Estee Lauder,* 430 F. Supp. 2d at 180. Rather, the "durational reasonableness of a noncompete agreement is judged by the length of time for which the employer's confidential information will be competitively valuable." *Id.* For the reasons discussed above, the type of business secrets and confidential information that Carson possesses from his employment at Flatiron will be valuable to Tempus for <u>at least</u> the one-year restrictive period set forth in the Agreement.

In *Papermaster,* the court found one-year prohibitions on competition and client solicitation to be "very limited in time." *Papermaster,* 2008 WL 4974508, at *11 (quoting *Natsource LLC v. Paribello,* 151 F. Supp. 2d 465, 471-72 (S.D.N.Y. 2001)). There, like here, the court determined that the trade secrets the former-employee was exposed to were "likely to remain competitively valuable to IBM and its competitors for more than a year." *Id.* Other courts applying New York law have upheld two and three-year noncompete periods. *See, e.g., Battenkill Veterinary Equine P.C. v. Cangelosi,* 768 N.Y.S.2d 504, 507 (3d Dep't 2003); *Alside Div. of Associated Materials Inc. v. Leclair,* 743 N.Y.S.2d 898 (3d Dep't 2002).

The geographical scope of Carson's restriction in the Agreement is worldwide, which also is reasonable because his former employer and his new employer compete without regard to geographical boundaries. The *Papermaster* court found that "the nature of IBM's business 'requires that the restriction be unlimited in geographic scope.'" *Papermaster,* 2008 WL 4974508, at *11 (quoting *Natsource,* 151 F. Supp. 2d at 471-72). Other courts have upheld worldwide limits on post-employment competition. *See, e.g., Estee Lauder,* 430 F. Supp. 2d at 181; *Bus. Intelligence Servs., Inc. v. Hudson,* 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984).

This is particularly true where, as here, there is a <u>narrow and well-defined market</u> in which the plaintiff-employer operates, and/or the market is one involving scientific invention or computer software. *Integra Optics, Inc. v. Messina*, 41 N.Y.S.3d 719 (Sup. Ct. Albany Cty., 2016) (enforcing 1-year non-competition agreement applicable to the "narrow and well-defined market" for fiber optic networks and components); *Cardwell v. Thermo Fischer Scientific*, 2010 WL 3825711 (S.D.N.Y. Sept. 23, 2010) (12-month restriction barring project manager from working for competing scientific instrument manufacturer).

Next, the covenant is enforceable both because it seeks to prevent Carson's use or disclosure of Flatiron's trade secrets and confidential business information, and to prevent him from using or disclosing confidential information regarding Flatiron's customers. An employer has a "legitimate interest" in "safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy." *Estee Lauder,* 430 F. Supp. 2d at 177 (quoting *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 308 (1976); *see also BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 391 (1999) (explaining that an employer has a "legitimate interest" in preventing the "competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment" (emphasis in original)). Therefore, "restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information." *Estee Lauder,* 430 F. Supp. 2d at 177 (quoting *Reed, Roberts,* 40 N.Y.2d at 308); *Nostrum Pharmaceuticals, LLC v. Dixit*, No. 13 Civ. 8718 (CM), 2016 WL 5806781 at *12 (S.D.N.Y. Sept. 23, 2016) (enforcing non-competition agreement, holding that former executive's position gave him access to information that provided him the opportunity to gain an advance over competitors who did not know information).

Here, as described above, Carson has intimate knowledge, and participated in the development, of trade secrets and proprietary information that forms the life-blood of Flatiron's business, including technical information.

Even assuming the best of faith, Carson will be unable to divorce himself from this wealth of knowledge, and he will use it for the competitive advantage of Tempus.

**B.    Flatiron is Likely to Prevail on its Claim for a Declaratory Judgment**

Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), a court "may declare the rights and other legal relations of any interested party seeking such a declaration" in "a case of actual controversy." Courts retain "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). Such discretion should be exercised where, as here, "(1)… the judgment will serve a useful purpose in clarifying and settling the legal relations in issue; and (2) …it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992) (citations omitted).

Here, Flatiron seeks a declaration that Carson's post-employment covenant barring employment by a Competitive Business is (i) facially valid and enforceable, and (ii) valid and enforceable with respect to employment with Flatiron's direct competitor, Tempus. Flatiron will be entitled to such a declaration because, as explained above, the covenant is enforceable under New York law and Tempus is a Competitive Business as defined in the Agreement.

**C.    Flatiron is Likely to Prevail on its Claim of Tortious Interference Against Tempus**

Flatiron is are likely to prevail on its claim against Tempus for tortious interference with the contractual relations between Flatiron and Carson. A claim for tortious interference with contractual relations requires the plaintiff to establish "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and

improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 172 (E.D.N.Y. 2010) (internal quotation marks and citation omitted); *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 415 (1996); *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group*, 87 N.Y.2d 614, 621 (1996).

Here, Flatiron has alleged, and provides sufficient evidence by way of sworn declaration, that it had a valid contract with Carson barring him from employment with a Competitive Business, that Tempus knew about the contract, and that Tempus intentionally procured Carson's breach of the Agreement to the detriment of Flatiron.

Injunctive relief is a proper remedy for inducing another to breach contractual obligations. *See American Para Professional Systems, Inc. v. Labone, Inc.*, 175 F. Supp. 2d 450 (E.D.N.Y. 2001) (enjoining former workers subject to non-competition agreement from contracting with plaintiff's currently-under-contract customers on the basis of tortious interference with contract allegations); *Long Island Am. Ass'n Football Club v. Manrodt*, 23 N.Y.S.2d 858 (Sup. Ct. Queens Cty. 1940) (enjoining football club owner from employing football players under contract with rival club owner); *Gold Bond Stamp Co. of N.Y. v. E.F. MacDonald Stamp Co. et al.*, 230 N.Y.S.2d 467, 470 (1st Dep't 1962) (enjoining trade stamp company who, with aid of competitor's former employees, induced competitor's customers to breach their licensing agreements with competitor). Flatiron "of course, need not wait for the threatened harm to occur before seeking judicial assistance. Indeed, the purpose of the injunctive relief is 'to prevent wrongs reasonably apprehended in the future.'" *American Para Professionals Systems*, 175 F. Supp. 2d at 457 (internal citation omitted).

By knowingly inducing Carson's breaches of the Agreement, Tempus is simultaneously and unlawfully reaping the benefits of having access to Flatiron's trade secrets and confidential information. An injunction is warranted to prevent Tempus from thus unfairly eroding Flatiron's market position.

III.    **SUFFICIENTLY SERIOUS QUESTIONS GO TO THE MERITS AND THE BALANCE OF THE EQUITIES WEIGHS IN FAVOR OF FLATIRON**

Even if this Court were not satisfied that Flatiron is likely to prevail on the merits of its claims, it has raised sufficiently serious questions going to the merits of the dispute and shown that the balance of the equities weighs in its favor to warrant the issuance of a preliminary injunction. In balancing the equities, a court "must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood." *Natsource LLC,* 151 F. Supp. 2d at 472 (quoting *Ticor Title*, 173 F.3d at 69).

Flatiron is only seeking on this motion to hold Carson to the bargain that he struck when he entered into the Agreement, and to protect its legitimate business interests in its trade secrets and confidential information, and their customer information. Even Carson explicitly agreed that he should be enjoined from working for a competitor for a year because he possessed Flatiron's confidential information if he did so.

Carson has now chosen to advance his career by leveraging his knowledge of Flatiron's business. Against that backdrop, compelling Carson to honor his contractual commitment to work outside of this niche industry for one year is not inequitable. Nor is there inequity in making him wait briefly while this Court decides Flatiron's preliminary injunction application. What is more, enforcement of the limited covenant will have no detrimental effect on Carson's ability to earn a living at a standard that far exceeds 99% of the population. Carson is a licensed, practicing oncologist who works at Washington University Hospital in St. Louis, with privileges at several other area hospitals. Carson also may work in the fields of data analysis, clinical trial research services, software services, analytics, and electronic medical record services, serving any employer that is not involved in the oncology industry. Carson holds a Ph.D. with an emphasis in health policy and administration from the University of Illinois School of Public Health. There are myriad positions in that field of study open to him. His career's work includes published peer-reviewed articles *outside* of oncology, including

concerning autoimmune hemolytic anemia, adverse drug events, progressive lultifocal leukoencephalopathy (viral disease), and obesity.

In contrast, Flatiron faces immediate and irremediable damage, including the disclosure of its trade secrets and other highly confidential information. In *Papermaster*, the Court found that the balance of equities favored IBM because "IBM's need to protect its legitimate business interests substantially outweighs the harm resulting to Mr. Papermaster from temporarily not working for Apple . . . ." *Papermaster*, 2008 WL 4974508, at *13. Similarly, any prejudice to Carson (and Tempus) is substantially outweighed by the prejudice Flatiron would suffer absent injunctive relief.

## IV.   THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER

The immediacy of Carson's impending employment with Tempus to Flatiron's extreme detriment justifies a temporary restraining order. *See* Fed. R. Civ. P. 65(b). Flatiron asked Carson twice when he planned to commence employment with Tempus; he offered vague and conflicting responses, but both times indicated that he will start very soon. Unless enjoined, Carson will violate the Agreement and use/disclose Flatiron's trade secrets and other confidential information, creating a real risk that "immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition." *Id.*

## CONCLUSION

For the foregoing reasons, Flatiron respectfully request that this Court grant its request for a temporary restraining order and a preliminary injunction.

Dated:   New York, New York
         September 27, 2019

DAVIS WRIGHT TREMAINE LLP

By: _____
    Lyle S. Zuckerman
    Laura Sack

1251 Avenue of the Americas, 21st Floor
New York, New York 10020
(212) 489-8230
*Attorneys for*
*Plaintiff Flatiron Health, Inc.*