UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------- X
FLATIRON HEALTH, INC.,                :
                                      :
                        Plaintiff,    :
                                      :
        - against -                   :
                                      :
KENNETH CARSON, M.D.,                 :
                                      :
                        Defendant.    :
--------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___4/1/2020___

19 Civ. 8999 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Flatiron Health, Inc. ("Flatiron") brought this action against its former employee, defendant Kenneth Carson, M.D. ("Carson"), to enforce a non-compete agreement.[1] Flatiron claimed that Carson anticipatorily repudiated the terms of the parties' Covenants Agreement (the "Covenants Agreement") by informing Flatiron that he accepted a job at Tempus Labs, Inc. ("Tempus") and planned to immediately begin work there. Flatiron sought a declaratory judgment, pursuant to 28 U.S.C. Section 2201, determining that the Covenants Agreement bars Carson from working for Tempus and soliciting Flatiron customers and employees for one year following his separation from employment by Flatiron, and that it also bars Carson from retaining, using, or disclosing any of Flatiron's trade secrets and confidential information. In addition, Flatiron

---

[1] Flatiron has since voluntarily dismissed its claims against Tempus Labs, Inc. (Dkt. No. 32.)

asked the Court for injunctive relief restraining Carson, until September 26, 2020, from violating the terms of the Covenants Agreement, including by working for Tempus, soliciting Flatiron's customers, or revealing Flatiron's trade secrets or confidential information.

The Court held a bench trial on January 27, 28, and 30, 2020 to adjudicate Flatiron's claims. On February 19, 2020, the Court issued a judgment denying Flatiron's request for a declaratory judgment that the Covenants Agreement bars Carson from, among other things, working for Tempus for one year following his separation from employment by Flatiron. (See Dkt. No. 94.) The Court also denied Flatiron's request for an injunction restraining Carson, until September 26, 2020, from working for Tempus, soliciting Flatiron's customers, or revealing Flatiron's trade secrets or confidential information. The Court indicated that a formal Decision and Order stating the Court's findings, reasoning, and conclusions would follow.

Shortly thereafter, Flatiron filed a motion (the "Motion"), under Federal Rule of Civil Procedure 62(d) ("Rule 62(d)"), asking the Court to enjoin Carson from working for Tempus or, alternatively, from violating certain limitations on the scope of his employment at Tempus, pending appeal of this Court's decision to the

United States Court of Appeals for the Second Circuit. Flatiron also asked the Court to temporarily restrain Carson from working for Tempus while Flatiron's Rule 62(d) motion was pending. Carson submitted an opposition ("Defendant's Opposition") to Flatiron's requests, and Flatiron submitted a reply ("Plaintiff's Reply").

On March 20, 2020 the Court issued a decision (the "March 20, 2020 Decision") setting forth the Court's findings of fact and conclusions of law in support of its February 19, 2020 judgment as required by Federal Rule of Civil Procedure 52(a). See Flatiron Health, Inc. v. Carson, No. 19 Civ. 8999, 2020 WL 1320867 (S.D.N.Y. Mar. 20, 2020).

For the reasons set forth below, the Court now **DENIES** Flatiron's request for a temporary restraining order, **DENIES** Flatiron's request for an injunction prohibiting Carson from working for Tempus pending appeal of this Court's decision to the Second Circuit, and **GRANTS IN PART** Flatiron's request for an injunction requiring Carson to abide by certain limitations on the scope of his employment at Tempus pending appeal of this Court's decision to the Second Circuit.

## I.  BACKGROUND

A.  THE COURT'S MARCH 20, 2020 DECISION

As set forth in the Court's March 20, 2020 Decision, the Court found that "Carson's role as Vice President of Clinical Solutions at Tempus would not overlap with his former employment at Flatiron." Flatiron Health, 2020 WL 1320867, at *11. More specifically, the Court found that "Carson's role at Flatiron involved *generating new evidence* to assist pharmaceutical companies, while Carson's role at Tempus is to assist doctors in *applying existing evidence* to treat individual patients." Id. (emphasis in original). The Court determined that Carson's role at Tempus would focus, in particular, on "identifying ways to help physicians use [Tempus's lab reports] more effectively to make informed treatment decisions for their patients." Id. Thus, "[a]ny data Carson collects and analyzes [at Tempus] will be data regarding physicians' use of Tempus's [lab reports]" -- for example, "how often physicians prescribe the drugs that the lab report identifies as potentially appropriate for them." Id. at *12. The Court determined that "conducting such analyses will not risk the use or disclosure by Carson of any Flatiron trade secrets." Id.

The Court concluded that the non-compete provision (the "Non-Compete") in the Covenants Agreement was "broader

than necessary to protect Flatiron's legitimate business interests" and therefore unenforceable. Id. at *22. For example, the Non-Compete "would prohibit Flatiron employees from working for companies that provide payroll or human resources 'software products' to hospitals" even though Flatiron does not sell such software. Id. at *20. Applying the considerations set forth by the New York Court of Appeals in BDO Seidman v. Hirshberg, 712 N.E.2d 1220, 1223 (N.Y. 1999), the Court further held that Flatiron had not "demonstrated its entitlement to partial enforcement of the Non-Compete." Id. at *23-24. The Court concluded, in particular, that "the Non-Compete's overbreadth is so obvious that Flatiron could not, in good faith, require almost all employees to agree to its terms." Id. at *24. Accordingly, the Court held that Carson had not anticipatorily breached the Non-Compete and denied Flatiron's request for a declaratory judgment that the Covenants Agreement barred Carson from working for Tempus. Nonetheless, the Court held that the separate non-disclosure provision of the Covenants Agreement remained enforceable and granted Flatiron's request for a declaratory judgment that Carson is contractually bound not to use or disclose Flatiron's trade secrets and confidential information.

The Court also denied Flatiron's request for a permanent injunction based on the Court's conclusion that Flatiron had not demonstrated irreparable harm. Although Flatiron demonstrated that Carson possessed knowledge of certain Flatiron trade secrets, the Court held that Flatiron did not demonstrate a risk that Carson would use or disclose those trade secrets in his role at Tempus.

B.   <u>THE PARTIES' ARGUMENTS</u>

In its Memorandum in support of its Rule 62(d) Motion ("Plaintiff's Memorandum"), Flatiron argues that it has shown the requisite possibility of success on appeal with regard to its claim that Carson anticipatorily repudiated the Non-Compete and its argument that Flatiron is entitled to a permanent injunction. (Pl.'s Mem. 7.) Flatiron contends that evidence adduced at trial indicates that: Carson will be working with real-world data at Tempus in a manner that will require him to use Flatiron's trade secrets, Tempus does not take seriously Carson's obligations to Flatiron, and Tempus lacks formal mechanisms to ensure Carson is not placed in a position where he could inadvertently disclose Flatiron's trade secrets. Flatiron argues that, in light of this evidence, its argument that Carson's role at Tempus will violate the Non-Compete has a substantial possibility of success on appeal. Flatiron

asserts that the agreement between Carson and Tempus to limit Carson's role until the Non-Compete expires presents a novel legal fact pattern. With regard to its anticipatory repudiation claim, Flatiron contends it has shown a possibility of prevailing on appeal based on the theory that the Court should have partially enforced the Non-Compete.

Flatiron also argues that it faces a risk of irreparable harm. It asserts that the promised limitations on Carson's role are unenforceable and not an adequate substitute for an injunction. Flatiron insists that, even if Carson's role at Tempus is as limited as he has promised, he might somehow unintentionally use or disclose Flatiron's trade secrets.

Flatiron contends that Carson would not be substantially harmed by an injunction prohibiting him from working at Tempus because Tempus paid him six months' salary and he has alternative employment and investment opportunities. Flatiron similarly argues that Carson would not be substantially harmed by an injunction that requires him to abide by limitations on his role at Tempus to which he testified he will adhere. Flatiron further asserts that, by protecting Flatiron's confidential information, an injunction would benefit the public interest.

In opposition, Carson argues that Flatiron is reiterating arguments that the Court already rejected and thus has not shown the requisite possibility of success on appeal. Carson maintains that Flatiron did not, in fact, demonstrate Carson's knowledge of its trade secrets at trial. While Carson testified that he gained knowledge of some Flatiron confidential and trade secret information, Carson argues that Flatiron has not demonstrated what specific Flatiron information he knows that has not become stale. Carson also contends that Flatiron ignores testimony at trial demonstrating that the manner in which Carson will be using data at Tempus will differ substantially from his data-related work at Flatiron such that he will not be at risk of using or disclosing Flatiron trade secrets. Relatedly, Carson argues that, in an attempt to identify evidence in its favor, Flatiron has resorted to mischaracterizing testimony and other trial evidence. In particular, Carson asserts that Flatiron mischaracterizes testimony concerning the relevance of real-world evidence to Carson's role at Tempus.

Carson argues that, insofar as Flatiron takes issue with the Court's findings of fact, which will be reviewed deferentially on appeal, it has not demonstrated a sufficient possibility of success. Carson also points out

that this case does not present a novel fact pattern
insofar as the Second Circuit has previously considered a
non-compete case where the employee and his new employer
agreed to limit the scope of his role while the employee
was bound by a non-compete. (See Def.'s Opp. 6-7 (citing
Int'l Bus. Machs. Corp. v. Visentin, No. 11 Civ. 399, 2011
WL 672025 (S.D.N.Y. Feb. 16, 2011), aff'd, 437 F. App'x 53
(2d Cir. 2011)).) In addition, Carson argues that Flatiron
has waived any argument for partial enforcement of the Non-
Compete, and, in any event, that Flatiron does not attempt
to explain why it would be entitled to partial enforcement.

Carson asserts that the Court rejected Flatiron's
arguments as to irreparable harm in denying Flatiron's
request for an injunction and that Flatiron offers no new
arguments or facts suggesting a risk that Carson will use
or disclose Flatiron's trade secrets. Moreover, Carson
notes that Flatiron ignores testimony and other trial
evidence regarding Tempus's restrictions on Carson's role
and, specifically, his access to Tempus's data sets.

Carson explains that an injunction would cause him
considerable harm. He points out that Tempus agreed to pay
him only six months' salary if he were enjoined from
working there and that he cannot reasonably be expected to
find a job as an oncologist for a six-month term given that

oncology is a practice that requires longitudinal care. He notes that he has not been able to identify opportunities to serve as an expert witness prior to 2021 and that the investment opportunity Flatiron refers to would not provide income comparable to his salary at Tempus. Carson further argues that the public has an interest in ensuring that overly broad non-competes are invalidated. According to Carson, granting a further stay would discourage similarly situated employees from challenging unjustifiably broad and anti-competitive non-competes. Carson maintains that the public interest will be harmed by an injunction that would prevent Carson from applying his education and experience to improve the treatment of cancer patients.

Finally, Carson argues that, contrary to Flatiron's representations, the supposedly narrower injunctive terms do not align with the limitations he and Tempus already placed on his role but would, in fact, require Carson to forego working at Tempus entirely.

Flatiron replies that it has made an adequate showing of a possibility of success and irreparable harm. (See Pl.'s Reply.) In particular, Flatiron asserts that Carson will be working at Tempus without formal mechanisms to wall him off from Tempus's business segments that compete with Flatiron. Flatiron argues that Carson never provided the

Court with a clear description of his future role at Tempus. Moreover, Flatiron insists that other trial evidence casts suspicion on Carson's testimony concerning the limits on his role at Tempus. For example, Flatiron emphasizes that Carson will report to Tempus's Chief Medical Officer, Gary Palmer ("Palmer"); that Palmer did not participate in defining Carson's responsibilities; and that Palmer expected Carson to work with Tempus's pharmaceutical clients. Similarly, Flatiron maintains that the description of Carson's role in his Tempus offer letter indicates that his role will require him to use or disclose Flatiron's trade secrets. Moreover, Flatiron argues that, unless Carson is prohibited from speaking to Tempus employees who work in business segments that compete with Flatiron, Carson cannot avoid using or disclosing Flatiron trade secrets.

Flatiron denies that it waived an argument for partial enforcement. Flatiron maintains that Carson may work as an oncologist, academic, and expert witness. Moreover, Flatiron insists that any marginal economic harm Carson may suffer is not severe enough to tip the balance of hardships in his favor. (See id. at 9.)

## II. **LEGAL STANDARD**

"While an appeal is pending from [a] . . . final judgment that . . . dissolves . . . an injunction, the court may . . . grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). To decide whether to grant an injunction pending appeal, courts in the Second Circuit consider:

> (1) whether there is a substantial possibility, although less than a likelihood, of success on appeal; (2) whether there is a risk of irreparable injury to the movant absent a stay; (3) whether there is substantial harm to the non-movant stemming from the grant of a stay; and (4) any public policy interest that may be affected by the stay.

Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York, No. 96 Civ. 8414, 2019 WL 2454094, at *3 (S.D.N.Y. June 12, 2019) (quotations omitted).

"The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors." Mohammed v. Reno, 309 F.3d 95, 101 (2d. Cir. 2002) (quotations and citations omitted). Courts may, for example, "grant[] a stay pending appeal where the likelihood of success is not high but the balance of hardships favors the applicant." Id. At the same time, however, courts are reluctant to grant an injunction pending appeal when doing so would, in effect, give the movant the "fruits of victory whether or not his appeal has

merit." Jimenez v. Barber, 252 F.2d 550, 553 (9th Cir. 1958); 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2904 (3d ed.) ("There is, of course, a considerable reluctance in granting an injunction pending appeal when to do so, in effect, is to give the appellant the ultimate relief being sought.").

### III. DISCUSSION

#### A.   POSSIBILITY OF SUCCESS ON APPEAL

In determining Flatiron's possibility of success on appeal, the Court is asked to assess the probability that it has erred. See Hayes v. City Univ. of N.Y., 503 F. Supp. 946, 963 (S.D.N.Y. 1980), aff'd, 648 F.2d 110 (2d Cir. 1981). Relevant considerations include "the extent to which the decision is supported by precedent" and "the standard of review that will govern the appeal." Id.

At the outset, the Court observes that Flatiron's argument appears principally to express disagreement with the Court's credibility determinations and interpretation of the testimony and other trial evidence. For example, Flatiron maintains that evidence indicates that Carson's role will entail working with real-world data in a manner that risks Carson using or disclosing Flatiron's trade secrets. Flatiron focuses, in particular, on: how Carson's offer letter from Tempus describes Carson's role; how

Tempus did not involve Palmer in defining Carson's role; Palmer's testimony that he expected Carson to work with Tempus's pharmaceutical clients; how Tempus's lab reports include insights drawn from real-world data; and communications in which Carson expressed his desire to participate in shaping Tempus's long-term vision and strategy. The Court's March 20, 2020 Decision, however, thoroughly explained why this evidence does not support an inference that Carson's role at Tempus will involve using or disclosing Flatiron's trade secrets. See Flatiron Health, 2020 WL 1320867, at *12-15.

Flatiron next contends that Ryan Fukushima ("Fukushima"), Tempus's Chief Operating Officer, contradicted his own and Carson's testimony concerning the role of real-world data in Tempus's clinical lab testing business and how Carson would use real-world data in his role at Tempus. But the Court heard and read this testimony, in full, for itself. As the Court's March 20, 2020 Decision explained, the Court interprets Fukushima's testimony that Carson would "be using aggregated data collected from real world settings" as "referring to how Carson would be helping physicians understand Tempus's lab reports, which occasionally include insights based on real-world data." Id. at *12 n.14 (quoting Tr. 420:3-5). The

Court determined that none of Fukushima's other statements
-- namely, that Carson will "help Tempus prioritize
solutions that will leverage Tempus's data to drive better
clinical decisions at the point of care" and "make sure
Tempus is . . . providing [doctors with] actionable
insights from Tempus's large library of data" -- "in any
way suggest[] that Carson himself will be analyzing data
from patient records to generate insights that physicians
can apply." Id. (quoting the Jan. 23, 2020 Decl. of
Fukushima ¶¶ 58, 63). Ultimately, Flatiron has not
persuaded the Court that Carson and Tempus made
"concessions . . . about the potential for overlap in even
[Carson's] interim job responsibilities." (Pl.'s Mem. 10.)

Relatedly, Flatiron overstates the degree of
uncertainty concerning Carson's future role at Tempus.
Because Tempus and Carson sufficiently defined the outer
bounds of Carson's future role, that Carson cannot say with
certainty what specific data analysis projects he will
conduct at Tempus is largely irrelevant. As the evidence at
trial established, "[a]ny data Carson collects and analyzes
at Tempus will be data regarding physicians' use of
Tempus's [lab reports]." Flatiron Health, 2020 WL 1320867,
at *12. In view of all the evidence offered at trial,
Flatiron's fear that Carson may find himself in

conversations, meetings, or other situations at Tempus that invite him to breach his confidentiality obligations to Flatiron appears conjectural.

If Flatiron persists in contesting the Court's credibility determinations and interpretation of testimony and other trial evidence on appeal, Flatiron is unlikely to succeed. As the Supreme Court has directed, where a district court's "account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though [it is] convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985). Moreover, many of the findings with which Flatiron takes issue were based, in part, on the Court's decision to credit the testimony of Carson and Fukushima, rather than that of Palmer, regarding the scope of Carson's role at Tempus. See, e.g., Flatiron Health, 2020 WL 1320867, at *13. For reasons explained in the Court's March 20, 2020 Decision, Carson's and Fukushima's testimony was not contradicted by extrinsic evidence. The Supreme Court has observed that findings "based on [a trial judge's] decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not

contradicted by extrinsic evidence . . . can virtually never be clear error." <u>Anderson</u>, 470 U.S. at 575.

Citing <u>BDO Seidman</u>, 712 N.E.2d at 1226, Flatiron asserts that it may succeed on appeal by arguing that the Court should have partially enforced the Non-Compete. (Pl.'s Mem. at 11.) However, based on the considerations set forth in <u>BDO Seidman</u>, the Court held in its March 20, 2020 Decision that Flatiron had not demonstrated an entitlement to partial enforcement. <u>See</u> <u>Flatiron Health</u>, 2020 WL 1320867, at *24. Flatiron offers no cases or arguments supporting a reversal of this holding. And, as the Court explained in its March 20, 2020 Decision:

> Even if partial enforcement of the Non-Compete were appropriate, the Court would not find that Carson anticipatorily breached the Covenants Agreement. Under a narrowed interpretation, the Non-Compete would prohibit only "associations by [Carson] that threaten [Flatiron's] legitimate interests against unfair competition from [Carson's] new employer." That Carson's association with Tempus does not threaten Flatiron's legitimate interests against unfair competition follows directly from the Court's findings of fact regarding the scope of Carson's role at Tempus.

<u>Id.</u> at *24 n.21 (quoting <u>GFI Brokers, LLC v. Santana</u>, No. 06 Civ. 3988, 2008 WL 3166972, at *10 (S.D.N.Y. Aug. 6, 2008)).

Nonetheless, "[a]bsent definitive appellate guidance, a court no matter how confident that its decision is

correct must recognize that it is operating in an area o[f] uncertainty." <u>Hayes</u>, 503 F. Supp. at 963. Accordingly, the Court concludes that Flatiron does not have a substantial possibility of success on appeal.

B.    <u>RISK OF IRREPARABLE INJURY</u>

In assessing the risk of irreparable injury, the Court is mindful that "the right to an appeal suggests suspension of any possible injury that would render the appeal meaningless." <u>Id.</u> The Court recognizes the possibility that, in this case, the Non-Compete may expire before the Second Circuit has an opportunity to render a decision.

Flatiron argues that it faces a risk of irreparable harm because Carson might inadvertently use or disclose Flatiron's confidential information in his role at Tempus. Because the Court has determined that Carson's proposed role at Tempus will not overlap with his previous role at Flatiron, the cases Flatiron cites -- <u>International Business Machines Corp. v. Papermaster</u>, No. 08 Civ. 9078, 2008 WL 497450 (S.D.N.Y. Nov. 21, 2008), and <u>Estee Lauder Cos. v. Batra</u>, 430 F. Supp. 2d 158, 176 (S.D.N.Y. 2006) -- are factually distinguishable. The employee in <u>Papermaster</u> possessed trade secret information about his former employer's microprocessor technology and was recruited by a competitor to manage the development of products powered by

microprocessors. 2008 WL 497450, at *8-9. Similarly, <u>Estee Lauder</u> involved an employee with knowledge of Estee Lauder's brand strategies and product development pipeline who began working on a competitor's business strategy before he even left Estee Lauder. <u>See</u> 430 F. Supp. 2d at 165, 176. Because, as the Court has concluded, Carson's role at Tempus would not overlap with his prior role at Flatiron, Flatiron does not face the same risks as the employers in <u>Papermaster</u> and <u>Estee Lauder</u>.

Flatiron's other arguments with respect to irreparable injury largely overlap with its arguments regarding its possibility of success. Consistent with the Court's acknowledgment that Flatiron does not have a substantial possibility of success on appeal, the Court determines that Flatiron has not shown a sufficient risk of irreparable injury.

C. <u>HARM TO CARSON AND THE PUBLIC INTEREST</u>

Enjoining Carson from working in any role at Tempus would harm Carson and the public interest. There is a significant chance that any injunction the Court issues pending appeal will remain in effect for the remainder of the one-year Non-Compete. The Court credits Carson's testimony that he is unlikely to be hired as an oncologist for a six-month term given that oncologists are expected to

provide long-term care. The Court is also persuaded that Carson's investment opportunities do not offer returns comparable to the salary he would earn at Tempus, and Carson has not been able to identify any opportunities to serve as an expert witness prior to 2021. Moreover, none of these alternative opportunities would allow Carson to apply his full skill-set and make a large-scale impact on the treatment of cancer patients. Enjoining Carson from working at Tempus would also sideline him from a fast-moving field during the peak of his career.

As the Court stated in its March 20, 2020 Decision, "[p]reventing Carson from working at the job where he would be most productive and make the largest impact on oncology care inflicts not only a private cost to Carson but also a social cost." Flatiron Health, 2020 WL 1320867, at *22. The obvious facial overbreadth of the Non-Compete, which Flatiron generally imposes on all employees regardless of their roles, suggests that Flatiron imposed the Non-Compete on Carson and its other employees without sufficient good faith justification. See id. *24. For the Court to nonetheless enjoin Carson from working at Tempus would signal to employers that they can benefit from knowingly imposing unjustifiably restrictive and anti-competitive agreements for as long as it takes to obtain a decision

from an appellate court. It would simultaneously discourage employees from challenging such excessive restrictions. Ultimately, economic welfare would suffer as overly broad non-competes proliferate, preventing employees from seeking out jobs in which their productivity and wages would be higher. See Harlan M. Blake, Employee Agreements Not To Compete, 73 Harv. L. Rev. 625, 649 (1960).

In comparison, requiring Carson to abide by the limitations that he and Tempus have mutually agreed upon would cause significantly less harm to Carson and the public interest. Appropriately tailored, such an injunction would enable Carson to conduct projects focused on improving physicians' understanding and use of Tempus's lab reports. The Court recognizes the inconveniences and costs arising from continued supervision by the Court but concludes that such concerns can be largely ameliorated by requiring Flatiron to post a bond.

D.  CONCLUSION

Balancing the above considerations, the Court concludes that Flatiron has not demonstrated its entitlement to an injunction prohibiting Carson from working at Tempus pending appeal. Flatiron's relatively weak showings with regard to its substantial possibility of success on appeal and its risk of irreparable injury cannot

justify the harm that such an injunction would inflict on Carson and the public interest. Given that the Non-Compete may expire before the Second Circuit renders a decision, enjoining Carson from working at Tempus would effectively give Flatiron the "fruits of victory" regardless of the merits of its claim. Jimenez, 252 F.2d at 553.

In contrast, an injunction that enforces the limits that Carson and Tempus already agreed to impose on Carson's role would not cause such substantial harm to Carson or the public interest. Assessing Flatiron's showings as to its substantial possibility of success and risk of irreparable injury under a correspondingly lower standard, the Court determines that Flatiron has demonstrated entitlement to a narrow injunction that requires Carson to comply with the limitations on his role at Tempus that he accepted voluntarily during the course of this litigation.

Flatiron presented the Court with a proposed order that Flatiron purportedly drafted to enforce only the limitations to which Carson and Tempus already agreed. Flatiron's proposed order would, however, plainly prevent Carson from performing the limited role that Tempus created for him. Specifically, Flatiron asks the Court to enjoin Carson from performing work related to any Tempus product that involves data from real-world settings. Because

Tempus's lab reports sometimes include data from real-world settings, this proposed term would prevent Carson from determining how to improve physicians' use and understanding of Tempus's lab reports.

Additional issues prevent the Court from adopting Flatiron's proposed terms. Flatiron's proposed injunction violates Federal Rule of Civil Procedure 65(d)(1) ("Rule 65(d)(1)") by incorporating certain restrictions and definitions by reference to the Covenants Agreement and other documents. In fact, Flatiron proposes that the Court incorporate certain definitions by reference to its January 27, 2020 Order, in which the Court explicitly stated that "Rule 65(d)(1) requires that every order granting an injunction and every restraining order must: ... describe in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required." Flatiron Health, Inc. v. Carson, No. 19 Civ. 8999, 2020 WL 257505, at *4 (S.D.N.Y. Jan. 27, 2020) (emphasis in original) (quotations and citations omitted).

An appropriately tailored injunction will permit Carson to work at Tempus and to conduct projects focused on improving physicians' understanding and use of Tempus's lab reports. It will also reflect Carson's representations that, while the Non-Compete is in effect, he will abide by

the nondisclosure provision of the Covenants Agreement; will not participate in developing business strategy for Tempus; will not participate in the curation, aggregation, or analysis of data for Tempus's pharmaceutical clients; and will not participate in the curation or aggregation of the real-world data that is presented in Tempus's lab reports.

## IV.   ORDER

Accordingly, it is hereby

**ORDERED** that the request of plaintiff Flatiron Health Inc. ("Flatiron") for a temporary restraining order prohibiting defendant Kenneth Carson, M.D., ("Carson") from working for Tempus Labs, Inc. ("Tempus") is **DENIED**; and it is further

**ORDERED** that Flatiron's request for an injunction pursuant to Rule 62(d) of the Federal Rules of Civil Procedure prohibiting Carson from working for Tempus pending appeal of this Court's February 19, 2020 and March 20, 2020 Orders is **DENIED**; and it is further

**ORDERED** that Flatiron's request for an injunction pursuant to Rule 62(d) of the Federal Rules of Civil Procedure requiring Carson to abide by certain limitations while working at Tempus pending appeal of this Court's

February 19, 2020 and March 20, 2020 Orders is **GRANTED IN PART**; and it is further

ORDERED that Carson may work at Tempus but must abide by the limitations stated in this Order; and it is further

ORDERED that pending appeal of this Court's February 19, 2020 and March 20, 2020 Orders or until September 26, 2020, whichever is earlier, Carson is enjoined from using or disclosing Flatiron's trade secrets, know-how, ideas, business plans, pricing information, the identity of and any information concerning Flatiron's customers or suppliers, computer programs (whether in source code or object code), procedures, processes, strategies, methods, systems, designs, discoveries, inventions, production methods and sources, marketing and sales information, information received from others that Flatiron is obligated to treat as confidential or proprietary, and any other technical, operating, financial and other business information that has commercial value, relating to Flatiron, its business, potential business, operations or finances, or the business of Flatiron's affiliates or customers, of which Carson may have acquired or developed knowledge during his work for Flatiron or from his Flatiron colleagues while working for Flatiron; and it is further

**ORDERED** that the term "trade secrets" as used in this Order shall refer to all information that is neither readily ascertainable through proper means nor generally known outside of Flatiron concerning Flatiron's data sets, data curation and aggregation rules and methods, use of machine learning, potentially patentable technologies, external control arms products, clinical trial matching products, prospective evidence generation projects, strategic business plans, and pricing strategy; and it is further

**ORDERED** that pending appeal of this Court's February 19, 2020 and March 20, 2020 Orders or until September 26, 2020, whichever is earlier, Carson is enjoined from participating in any committee at Tempus that discusses matters including Tempus's business strategy, products, data aggregation business, or methods for data curation, aggregation, or analysis, except that Carson may provide updates to such committees concerning his work and may participate in any committee that focuses exclusively on Tempus's strategy for improving physicians' use and understanding of Tempus's lab reports; and it is further

**ORDERED** that pending appeal of this Court's February 19, 2020 and March 20, 2020 Orders or until September 26, 2020, whichever is earlier, Carson is enjoined from

conducting any consultations or discussions about the addition of new products or strategies at Tempus, except that Carson may explore and discuss new strategies for improving physicians' use and understanding of Tempus's lab reports; and it is further

**ORDERED** that pending appeal of this Court's February 19, 2020 and March 20, 2020 Orders or until September 26, 2020, whichever is earlier, Carson is enjoined from performing any work for Tempus's pharmaceutical company business, including database products sold to pharmaceutical companies, and from discussing anything related to Tempus's pharmaceutical business with anyone at Tempus; and it is further

**ORDERED** that pending appeal of this Court's February 19, 2020 and March 20, 2020 Orders or until September 26, 2020, whichever is earlier, Carson will not participate in curating, aggregating, and analyzing the real-world data used in Tempus's pharmaceutical business or presented in Tempus's lab reports, or provide input regarding the methods, rules, and processes Tempus uses for curating, aggregating, and analyzing the real-world data used in Tempus's pharmaceutical business or presented in Tempus's lab reports, except that Carson may collect, compile, and

27

analyze data concerning physicians' understanding and use of Tempus's lab reports; and it is further

**ORDERED** that, on May 15, 2020 or thirty days after Carson commences work at Tempus, whichever is later, Carson will submit a certification of his compliance with the terms of this Order by letter not to exceed three pages addressed to the Court and to Flatiron, which may be submitted via email; and it is further

**ORDERED** that issuance of this injunction is conditioned upon Flatiron posting a bond in the amount of $25,000.00 by 5:00 p.m. on April 6, 2020.


**SO ORDERED.**


Dated: New York, New York
      1 April 2020


_____
Victor Marrero
U.S.D.J.